JUDGE SCHOFIELD

**14 CV 3943**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

NEW BALANCE ATHLETIC SHOE, INC.,

    Plaintiff,

    v.

KARL LAGERFELD, KARL LAGERFELD
B.V., KARL LAGERFELD RETAIL B.V.,
KARL LAGERFELD GROUP B.V., and NET-
A-PORTER GROUP LLC

    Defendants.

C.A. No. _____



### COMPLAINT

1.    This case concerns the infringement and dilution of three federally-registered and incontestable trademarks and the infringement of common law trade dress owned by New Balance Athletic Shoe, Inc. ("New Balance"). Defendants Karl Lagerfeld, Karl Lagerfeld B.V., Karl Lagerfeld Retail B.V., Karl Lagerfeld Group B.V. (together "Lagerfeld") recently began selling athletic footwear through their exclusive on-line retailer Net-a-Porter Group LLC ("Net-a-Porter") that is confusingly similar to and dilutes New Balance's registered and common law rights in several respects:

<strong>NEW BALANCE</strong>           <strong>LAGERFELD</strong>




2.     As set forth more fully below, New Balance is the owner of famous, federally-registered, and incontestable trademarks for the block capital letter "N" used in connection with athletic footwear and for a block capital letter "N" located in a particular place and angle on the side of a shoe. *See* Exhibit A (U.S. Reg. Nos. 3,282,106 (block capital letter "N," issued August 21, 2007 for "athletic footwear" in class 25) and 1,308,133 (block capital letter "N" located at an angle on the side of a shoe, issued December 4, 1984 for the same) (the "Block N Marks")). The Block N Marks also are the subject of approximately 70 foreign trademark registrations around the world.

3.     New Balance also is the owner of a famous, federally-registered, and incontestable trademark for the block capital letter "N" with a saddle device, which is identified below by the shaded area surrounded by solid lines:



*See* Exhibit B (U.S. Reg. No. 1,344,589 (issued June 25, 1985 for "athletic footwear" in class 25) (the "Block N with Saddle Device Mark")).

4.     New Balance has exclusively used the Block N Marks in commerce in connection with footwear since the 1970s. Moreover, the Block N with Saddle Device Mark has prominently appeared on much of the athletic footwear sold by New Balance for more than thirty years. New Balance has invested significant time, energy, and tens of millions of dollars in the

2

advertising, promotion, and offering of its products under the marks. New Balance has sold hundreds of millions of pairs of shoes worldwide bearing the marks, representing many billions of dollars in sales. These marks are famous and embody an enormous amount of goodwill, which is a valuable asset of the company.

5.     Lagerfeld's intentional adoption of a block capital letter "K" in the context of an otherwise nearly identical shoe design is likely to cause confusion among consumers in violation of 15 U.S.C. § 1114 and/or suggest an affiliation, connection, or association between New Balance and Lagerfeld in violation of 15 U.S.C. § 1125. Lagerfeld's use of a block capital "K" in the context of an otherwise nearly identical shoe design also is likely to dilute the distinctive source-identifying quality of the famous Block N Marks in violation of 15 U.S.C. § 1125(c).

6.     Lagerfeld's intentional adoption of a block capital letter "K" and nearly identical saddle device in the context of an otherwise nearly identical shoe design is likely to cause confusion among consumers in violation of 15 U.S.C. § 1114 and/or suggest an affiliation, connection, or association between New Balance and Lagerfeld in violation of 15 U.S.C. § 1125. Lagerfeld's use of the block capital "K" and nearly identical saddle device in the context of an otherwise nearly identical shoe design also is likely to dilute the distinctive source-identifying quality of the famous Block N with Saddle Device Mark in violation of 15 U.S.C. § 1125(c).

7.     In addition to its registered Block N-formative trademarks, New Balance has common law trade dress rights in the configuration of (i) a family of classic shoe designs (the "Family Trade Dress") and (ii) the 620 model (the "620 Trade Dress"), which is a member of that trade dress family.

8.     These classic designs are casual "lifestyle" shoes, and the primary purpose and impact of the overall design is to identify New Balance as the source of the goods.

3

9.     Since the mid-1990s New Balance has spent millions of dollars promoting the design family and developing consumers' exclusive association between the distinctive designs and New Balance. Most recently, a core member of that classic design family, the 574 model, became the centerpiece of a multi-million dollar advertising campaign called the "574 Location Program." The campaign was developed independently by a third-party advertising firm that studied New Balance's history. Based on its analysis, the firm identified the 574 as "*the*" iconic New Balance design. The popularity of the 574 design has led New Balance, both on its own and with various artists and designers worldwide, to create different "special editions" of the 574 in upscale colors and fabrics. These special editions are highly sought after and routinely sell out.

10.     Another member of the classic design family, the 620, is equally as iconic and source identifying. That design was recently the subject of a collaboration with J. Crew where the design was promoted by J. Crew as a fashion shoe. The J. Crew collaboration received enormous publicity—including the cover of J. Crew catalogs that are mailed to two million customers every month:



4

The collaboration with J. Crew was an unqualified success, immediately selling out.

11. The 574 is sold worldwide and is New Balance's best-selling casual shoe model. Since 2002, New Balance has sold more than 20,000,000 pairs of the 574 worldwide. Between 2004 and 2005, New Balance sold over 13,000,000 pairs of the 574, making it one of the most popular lifestyle shoe designs sold by any manufacturer. The 620 also is enormously popular, selling hundreds of thousands of pairs since 2012.

12. Reflecting their popularity and iconic status, these classic designs are often counterfeited and New Balance routinely enforces its trade dress rights through legal actions, including product seizures in Hong Kong and elsewhere. Efforts to "knock off" the design are not limited to bargain counterfeiters; a fashion house also used the iconic New Balance trade dress without authorization, resulting in litigation. New Balance has spent millions of dollars and thousands of hours protecting its goodwill in the designs.

13. Given Lagerfeld's use of a virtually identical trade dress, ordinary consumers are likely to be confused and erroneously believe that New Balance has an affiliation, connection, or association with the Lagerfeld shoe, or that New Balance has sponsored or approved the use of the design by Lagerfeld. Knowledgeable third-party fashion journalists agree: **"Wait did Karl Lagerfeld just knock-off New Balance sneakers?"** *See* http://www.shefinds.com/2014/wait-did-karl-lagerfeld-just-knock-off-new-balance-sneakers/.

14. Lagerfeld's infringement of New Balance's trademarks and trade dress has and will irreparably harm New Balance and the substantial goodwill New Balance has developed in the same. It also has and will cause monetary harm in an amount to be determined at trial.

## PARTIES

15. New Balance Athletic Shoe, Inc. is a Massachusetts corporation with its principal place of business at 20 Guest Street, Boston, Massachusetts 02135.

16. Upon information and belief, defendant Karl Lagerfeld is an individual with a principal residence on the Quai Voltaire, 75007 Paris, France and with places of business at 25, rue Vieille du Temple, 75004 Paris, France and 21 Rue Saint Guillame, 75007 Paris, France.

17. Upon information and belief, Karl Lagerfeld B.V. is a foreign business entity organized under the laws of the Kingdom of the Netherlands, with a principal place of business at Looiersgracht 43 1016 VR Amsterdam, Noord-Holland, The Netherlands.

18. Upon information and belief, Karl Lagerfeld Retail B.V. is a foreign business entity organized under the laws of the Kingdom of the Netherlands, with a principal place of business at Looiersgracht 43 1016 VR Amsterdam, Noord-Holland, The Netherlands.

19. Upon information and belief, Karl Lagerfeld Group B.V. is a foreign business entity organized under the laws of the Kingdom of the Netherlands, with a principal place of business at Looiersgracht 43 1016 VR Amsterdam, Noord-Holland, The Netherlands.

20. Upon information and belief, defendant Net-a-Porter Group LLC is a New York corporation, with a principal place of business at 100 Fifth Avenue, New York, New York 10011.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1332(a)(2), 1338(a) and (b), and this Court's supplemental jurisdiction under 28 U.S.C. § 1367. Plaintiff corporation is a citizen of Massachusetts. Upon information and belief, Defendant corporations are citizens of foreign countries (Lagerfeld) and New York (Net-a-

6

Porter). As such, there is complete diversity of the parties. The matter in controversy exceeds $75,000, exclusive of interests and costs.

22.     Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because this is the judicial district where (i) a substantial part of the events or omissions giving rise to the claim occurred and (ii) where Defendants are subject to personal jurisdiction.

23.     Upon information and belief, all Defendants regularly solicit and conduct business in the State of New York. Specifically, Defendants promote and sell their goods, including the Karl Lagerfeld shoes at issue here, within the State of New York. In addition, upon information and belief, Defendants or their agents maintain websites available in New York, www.karl.com and www.net-a-porter.com, which facilitate and/or enable users to purchase the infringing goods from New York.

## FACTS

24.     New Balance is a private company that was founded in 1906. Today, New Balance is one of the largest athletic shoe companies in the world, with over 4,000 employees and approximately $2 billion in annual sales worldwide in 2013. It is the only major company that manufactures athletic footwear in factories in the United States.

25.     Since its earliest days, New Balance has focused on fit and authenticity as its core brand message. New Balance is one of the few athletic footwear manufactures to make shoes in true width sizing, rather than the more common narrow and wide. Because of its brand qualities New Balance has the most brand-loyal customers in the marketplace. New Balance won the No. 1 Customer Loyalty Award in the athletic footwear category for eight consecutive years

7

from Brand Keys, an independent group that identifies the brands that are best able to engage consumers and create loyal customers.

### The Block N and the Block N with Saddle Device Marks

26. Since at least as early as the 1970s New Balance has exclusively used a distinctive block capital letter N to identify its goods. The Block N Marks have appeared on the side of nearly all New Balance footwear and apparel for more than thirty years. Today, the N mark is used on approximately 50,000,000 pairs of shoes sold annually in over 60 countries worldwide.

27. New Balance has been diligent in protecting its rights in the Block N Marks. It is the owner of an incontestable federal registration for the block capital letter N as shown here:



*See* Exhibit A.

28. New Balance also is the owner of an incontestable federal registration for the block capital letter N located in a particular place and angle on the side of a shoe as shown here:



*See* Exhibit A (describing broken lines in specimen drawing as forming no part of the mark, but "show[ing] the location of the mark in use").

8

29. In addition to its domestic registrations, New Balance has registered its Block N Marks around the world. New Balance has active registrations in good standing for the Block N Marks in Mexico, Brazil, Japan, Australia, Canada, Chile, Hong Kong, Israel, New Zealand, Russian Federation, Singapore, South Africa, Taiwan R.O.C., Turkey, Vietnam, Argentina, Dominican Republic, Colombia, Uruguay, United Kingdom, France, Germany, Italy, Romania, Spain, Denmark, Ukraine, Portugal, Venezuela, Hungary, and Sweden.

30. In addition to the Block N Marks, New Balance has long exclusively used a block capital N in connection with a distinctive Saddle Device that is central to the design of many of its all-time most popular shoes. Below it is shown on the 620 model:



31. New Balance has been diligent in protecting its rights in the Block N Mark with Saddle Device. It is the owner of an incontestable federal registration for the capital block letter N with Saddle Device as shown below shaded and bordered by solid lines:



*See* Exhibit B (describing broken lines in specimen drawing as forming no part of the mark and identifying stippling as defining "the extended saddle device").

32.     New Balance's long-standing widespread exclusive use, worldwide sales, and widespread marketing has made the Block N and Block N with Saddle Device marks famous.

### The Origin of The Iconic New Balance "Look" or Trade Dress

33.     During the 1980s athletic footwear became more than useful items, some models became fashion or status symbols. Other leading athletic footwear companies seized on this trend and employed celebrities and athletes to sell their shoes and tout their latest fashion-forward designs. Shoe companies became marketing companies that no longer manufactured their own shoes, but bought them from third-party factories overseas and spent millions on advertising. New Balance famously refused to follow this trend, and kept its focus on technical fit and authenticity. As a result of this focus on substance over popularity, New Balance shoes were typically not considered fashionable among those seeking a fashion shoe.

34.     In 1980 New Balance introduced the 620. The 620 was a technological leap in athletic shoe design; indeed, it was the lightest shoe on the market at the time. It also was the first shoe of its type to break the $50 price point. Among other design elements it was designed to incorporate the iconic N Mark and N with Saddle Device Mark. The 620 was an enormous success, selling hundreds of thousands of pairs.



35.     In 1983, New Balance developed another shoe design that further came to embody its brand focus on substance over fashion, the 990 model. The 990 was considered a highly technical running shoe at the time and the first shoe of its type to break the $100 price point. The 990 also was an enormous success, selling millions of pairs.



36.     Following the success of the 620 and 990, in 1988 New Balance designed a new shoe—the 576—that was intended to give consumers the iconic look of its predecessors at a lower price point. The 576 was a huge success, also selling millions of pairs.

11



37.     Counter-intuitively and perhaps *because* of its un-fashionable look, the 576 was adopted by the fashion conscious and celebrities as an "it" shoe in the mid-1990s, particularly in Great Britain and France.

38.     For example, the 576 was prominently featured on the cover of the famous fashion magazine *Elle* in its France edition. This was an extremely rare placement for a non-fashion product. The 576 also was a prominent part of a fashion spread inside the magazine. This exposure garnered enormous publicity for the 576 and New Balance among the fashion-conscious and the general public.

39.     The 576 also was featured on fashion runways by famous designer Lucien Pellat-Finer. It was prominently worn by best-selling British rock groups such as Oasis, whose lead singer, Liam Gallagher, is reported to own hundreds of them.

40.     The adoption of the 576 by the fashion and celebrity set as the new "it" shoe essentially created a new market niche in footwear—the retro-looking "lifestyle" sneaker—for which the 576 was the inspiration. *See, e.g.*, Exhibit C. According to one British news article, "Anna Wintour, editor of American Vogue, and Naomi Campbell became fans [of the 576], [and] the boom in 'old school' trainers was on." *See id.*

12

41.     Another British news article in the Independent on Sunday summarizes, "Twenty thousand were sent to Europe. Hip Paris department store Colette started stocking them and they were soon spotted by French fashion editors. Hundreds of thousands were sent over, and they flew off shop shelves."

42.     As a result of this accidental fame, the 576 was identified in the British press as one of the top ten iconic athletic footwear designs of all time. *See* Exhibit D.

43.     With the emergence of the new lifestyle category, New Balance began selling casual shoes intended to cater to the athletic minded, but less technically demanding consumer. Recognizing that the classic 620, 990, and 576 models defined the New Balance brand for its loyal consumers and that the 576 had become an accidental fashion icon, New Balance designed a new shoe, the 574, using many of the same distinctive design elements and trade dress.



44.     The 574 was designed to embody the New Balance brand and leverage the consumers' existing association of the 620, 990, and 576 models with New Balance as source. It is expressly marketed as a "classic" lifestyle shoe.

45.     The 574 has been an enormous success and is New Balance's most famous, recognizable, and iconic individual shoe design. Since 2002, New Balance has sold more than

20,000,000 pairs of 574s worldwide. Between 2004 and 2005, New Balance sold over 13,000,000 pairs of 574s—making it one of the most popular athletic footwear designs sold by any manufacturer in the world during that time.

46. Its popularity led New Balance to collaborate with others to use the 574 design as a platform for special editions. For example, the 574 was used for New Balance's popular line of children's sneakers bearing the famous Sesame Street characters. The Sesame Street 574s were nationally advertised on the children's television network Nickelodeon, among other media. Similarly, New Balance licensed Charles Schultz's famous Peanuts characters for another line of children's 574s.

47. The 574 also is the design used by New Balance for special "limited edition" versions designed by the company or designed in collaboration with famous third-party fashion designers or shops. For example, in 2007 New Balance created a limited edition flag collection using the 574 design, which featured fabrics and colors intended to replicate the flags of several nations. More recently, New Balance has used the 574 as the model for numerous highly sought after limited editions, with themes such as "National Parks," "Yacht Club," "Atmospheres," "Summer Solution," and "Passport Pack."

48. Since its inception, New Balance has spent millions of dollars to advertise the 574 model. In addition, the 574 was the subject of a multi-million dollar campaign that was specifically designed to further associate the design with New Balance as its source.

49. The popularity of the 574 as a casual lifestyle shoe caused New Balance to refocus on its existing classic styles and to re-issue the 620 as a classic lifestyle shoe.

50. In 2012, New Balance began collaborating with the famous American fashion company J. Crew to release a special J. Crew edition of the New Balance model 620. The

14

collaboration was widely promoted through paid and organic advertising and publicity. The 620 recently appeared on the cover and inside several editions of the J. Crew catalog, which is delivered to 2,000,000 customer homes monthly. The collaboration also is routinely the subject of articles in fashion magazines and fashion columns, which recently include: *Vogue* (April 2014) (1,222,373 media impressions), *GQ* (April 2014) (2,408,768 media impressions), and the *New York Daily News* (March 2014) (1,290,413 media impressions).

51.     The re-issue of the 620 as a lifestyle shoe has been an enormous success. The J. Crew "neon mango" colorway sold out in approximately two weeks. Worldwide New Balance has sold more than 600,000 pairs of the 620 model in just two years.

52.     New Balance continues to collaborate with J. Crew and is exploring additional collaborations involving the 620 model.

53.     Based on its fame and popularity, the 620/990/576/574 design family[1] has acquired secondary meaning. New Balance has been the exclusive user and the sole source of the designs that make up the family since at least as early as the 1990s. The primary purpose of the design family among consumers is to identify New Balance as source.

54.     The sales success of the models also evidences the secondary meaning in the design family.

55.     The design family is frequently the subject of unsolicited media coverage and has been repeatedly recognized for its popularity and iconic status. *See, e.g.*, Exhibit E.

56.     The 574 and 620 are particularly popular among the fashion conscious and celebrity trend-setters. Celebrities frequently seen wearing 574s and/or 620s include Rihanna, Pharrell, Adam Scott, Seth Rogan, Josh Hartnett, Elijah Wood, Will Ferrell, Penn Badgley, Robert

---

[1] Other of New Balance's shoes are also in the design family, including the 420.

Downey, Jr., Giovanni Ribisi, Jim Carey, and Michael Rapaport. *See, e.g.*, Exhibit F. New Balance pays none of these people to wear its shoes.

57.    New Balance's secondary meaning in the design family is further evidenced by the fact that the designs are frequently the subject of attempts to counterfeit the designs. Since its release, New Balance has spent millions of dollars and thousands of hours protecting its rights in the design family through legal actions, including seizures of counterfeit goods in Hong Kong and elsewhere. For example, New Balance pursues approximately twenty counterfeiting matters regarding the 574 each year, and has spent into the millions of dollars on its policing efforts.

58.    The overall design of the Family Trade Dress and 620 Trade Dress is not functional in its combination of elements.

59.    By virtue of consumers' exclusive association of the non-functional designs with New Balance, New Balance has developed protectable trade dress rights in a family of overall design, including the shape and style of construction. Specifically, New Balance has developed protectable rights in a family of trade dress that includes, among other elements, the combination of (i) the shape or silhouette, comprised of a sole that shows its tread in profile and protrudes slightly from the bottom rear and angles in towards the heel; a high back with a deep plunging collar; and a slightly rounded toe on which the sole reaches up; and (ii) the style of construction, comprised of an angled foxing at the heel, which angle rises from mid-foot; a padded ankle collar defined by an open U-shape above a narrow V-shaped piece; a saddle rising from the mid-sole to the eyelets and reaching around the lowest eyelet to form a single piece with the other side; a vamp open on top to show a separate piece of fabric; a tongue with a label on top; visible stitching on panels; a sole topped by the appearance of cut EVA sole with a contrasting sole

16

insert or wedge; a separate ankle collar tab piece; and the placement, angle, and size of a logo on the saddle consisting of a stylized block capital letter.

60.     In addition, by virtue of consumers' exclusive association of the non-functional designs with New Balance, New Balance has developed protectable trade dress rights in the overall design of the 620, including the shape and style of construction. Specifically, New Balance has developed protectable rights in the 620 trade dress that includes, among other elements, the combination of (i) the shape or silhouette, comprised of a sole that shows its tread in profile and protrudes slightly from the bottom rear and angles in towards the heel; a high back with a deep plunging collar; and a slightly rounded toe on which the sole reaches up; and (ii) the style of construction, comprised of an angled foxing at the heel, rising from mid-foot; a padded ankle collar defined by an open U-shape above a narrow V-shaped piece; a saddle rising from the mid-sole to the eyelets and reaching around the lowest eyelet to form a single piece with the other side; a vamp open on top to show a separate piece of fabric and open along the saddle to the sole; a tongue with a label on top; visible stitching on panels; a sole topped by the appearance of cut EVA sole with a contrasting sole insert or wedge; and the placement, angle, and size of a logo on the saddle consisting of a stylized block capital letter.

## Defendants and Their Infringing Conduct

61.     Karl Lagerfeld is a world famous fashion designer. He has worked for some of the world's most iconic brands, including Chanel and Fendi, for decades.

62.     In addition to his work for other fashion houses, Mr. Lagerfeld has established his own family of companies to design and sell LAGERFELD brand goods. Upon information and belief, these companies include defendants Karl Lagerfeld B.V., Karl Lagerfeld Retail B.V., and Karl Lagerfeld Group B.V.

17

63. Upon information and belief, Lagerfeld's exclusive distributor for the infringing footwear in the United States is defendant Net-a-Porter, a New York company that operates a website that sells high-end and luxury designer goods.

64. Upon information and belief, in or about March 2014, Lagerfeld began selling through Net-A-Porter the athletic footwear shown below:



65. Upon information and belief the Lagerfeld shoes are available for sale in New York for a retail price of approximately $360. *See* Exhibit G.

66. The Lagerfeld shoes infringe New Balance's exclusive rights in the Block N Marks, the Block N Mark with Saddle Device, the Family Trade Dress, and the 620 Trade Dress.

67. Specifically, Lagerfeld's intentional adoption of a block capital letter "K" in the context of an otherwise nearly identical shoe design is likely to cause confusion among consumers in violation of 15 U.S.C. § 1114 and/or suggest an affiliation, connection, or association between New Balance and Lagerfeld in violation of 15 U.S.C. § 1125. Lagerfeld's use of a block capital "K" in the context of an otherwise nearly identical shoe design also is

18

likely to dilute the distinctive source identifying quality of the famous Block N Marks in violation of 15 U.S.C. § 1125(c).

68. Lagerfeld's intentional adoption of a block capital letter "K" and nearly identical saddle design in the context of an otherwise nearly identical shoe design is likely to cause confusion among consumers in violation of 15 U.S.C. § 1114 and/or suggest an affiliation, connection or association between New Balance and Lagerfeld in violation of 15 U.S.C. § 1125. Lagerfeld's use of the block capital "K" and nearly identical saddle design in the context of an otherwise nearly identical shoe design also is likely to dilute the distinctive source identifying quality of the famous Block N with Saddle Device Mark in violation of 15 U.S.C. § 1125(c).

69. In addition, the Lagerfeld model uses a confusingly similar overall combination of design elements that make up the shape and style of construction of the New Balance Family Trade Dress and 620 Trade Dress. To the extent that Defendants do not exactly copy the individual elements, when taken together the Lagerfeld model is nonetheless confusingly similar to the New Balance Family Trade Dress and 620 Trade Dress.

70. Upon information and belief, given the fame of New Balance's trademarks and trade dress Defendants must have known of New Balance's rights in the marks and the trade dress. Also, given New Balance's global registrations for the Block N Marks and the Block N with Saddle Device Mark Defendants had at least constructive notice of New Balance's rights in those marks. As a result, Defendants' infringement is intentional. In addition, Defendants intended to dilute the distinctive source identifying quality of the New Balance trademarks and trade dress.

71. Defendants' apparent intent to trade off of New Balance's well-established secondary meaning and commercial strength in its trade dress has been widely recognized. Numerous shoe

19

and fashion bloggers and journalists on the Internet acknowledge the fame of the New Balance

trade dress and have commented on the striking similarity of the Lagerfeld design.  For example:

- **"Wait did Karl Lagerfeld just knock-off New Balance sneakers?"** *See* http://www.shefinds.com/2014/wait-did-karl-lagerfeld-just-knock-off-new-balance-sneakers/ ("So should [we] be that surprised that Karl Lagerfeld, the man, the myth, the legend, created his own pair of kicks that look almost identical to New Balance sneakers? Yes, the head designer and creative director of Chanel knocked-off the shoes your grandpa wears.").  *See also* http://womenlately.com/wait-did-karl-lagerfeld-just-knock-off-new-balance-sneakers/; http://www.shefinds.com/2014/wait-did-karl-lagerfeld-just-knock-off-new-balance-sneakers/.

- **"Karl Lagerfeld or New Balance? Luxe or Faux?"** *See* http://nakedfashions.com/2014/03/21/karl-lagerfeld-or-new-balance-luxe-or-faux/ ("But then, looking closely, you see how alike they are to New Balance's.  I mean, if I saw someone walking down the street in these and didn't know anything about the Karl Lagerfeld version then I'd think they'd bought a fake pair of New Balance's.").

- **"A pair of Karl Lagerfeld that could have been designed by New Balance."** *See* http://blogs.glamouratis.elconfidencial.com/moda/objeto-de-deseo/2014-04-02/unas-zapatillas-de-karl-lagerfeld-que-habrian-podido-disenar-en-new-balance_110719/ (observing that "only the Kaiser might dare to create shoes identical to those of another firm").

- **"Karl Lagerfeld: 'I always think I'm lazy, maybe I could do better'"** *See* http://www.theguardian.com/fashion/2014/mar/25/karl-lagerfeld-genius-modern-fashion-chanel ("In the new Lagerfeld store, a whole wall is dedicated to Technicolor retro-styled trainers with a K initial on the side that resemble the New Balance pair that have been breeding on streetstyle blogs over the past 18 months.").

- **"With a K"** *See* http://www.kargarohhsnap.com/2014/04/with-k.html ("Coincidentally, some of my favorite designers have a "K" name and I just so happen to be crushing on all these K designer items, especially the Lagerfeld sneakers that resemble my New Balance 410's.").

- **"Proof Karl Lagerfeld loves New Balance"** *See* http://jascmeen.com/2014/03/24/now-we-know-karl-lagerfeld-loves-new-balance/.

- **"They're more New Balance than Haute Couture, but the color palette will work well year-round."**  Caption to photograph of new Lagerfeld footwear. *See* http://www.thefashionspot.com/shop/395831-designer-sneakers-rick-ownes-valentino-hussein-chalayan-and-more/#/slide/9.

- **"Some scrumptious treats topped off by one of King K's signature plays on New Balance trainers."**  Caption to photograph of new Lagerfeld footwear. *See* http://www.theglassmagazine.com/lagerfeld-takes-london-and-the-world-stands-by/.

Consumers and potential consumers have made similar observations. *See* Exhibit H.

72. Lagerfeld's infringing shoes and the New Balance shoes in its casual "lifestyle" category are marketed and sold to overlapping classes of purchasers insofar as the New Balance shoes are extremely popular within fashion and celebrity circles, *i.e.*, among those who may choose to spend upwards of $300.00 for a casual "lifestyle" sneaker.

73. Lagerfeld and New Balance advertise through overlapping marketing channels insofar as they use popular magazines and the Internet to advertise the relevant goods. In addition, the parties' relevant goods are routinely the topic of discussion in the same fashion magazines and on popular fashion websites and blogs.

74. Lagerfeld and New Balance sell the relevant goods through overlapping sales channels insofar as they both sell their goods through brick and mortar stores (such as Nordstrom) and through the Internet. Moreover, in addition to selling the Lagerfeld infringing shoes, Net-a-Porter sells J. Crew products.

75. Mr. Lagerfeld is well known for his licensed collaborations with iconic third-party brands. Indeed, according to Lagerfeld CEO Pier Paolo Righi, "Karl is probably the master of collaborations and has started many of the most renowned design collaborations. Every week we receive so many requests for collaborations that we have stopped counting." *See* Exhibit I (http://www.cpp-luxury.com/the-success-behind-the-karl-lagerfeld-brand-exclusive-interview-with-ceo-pier-paolo-righi/). These collaborations include applying the Lagerfeld brand to third-party trade dress. For example, in 2011 he worked with Coca-Cola to apply his brand to what is perhaps the world's most famous trade dress—the Coca-Cola bottle:



*See* Exhibit I (http://www.adweek.com/adfreak/karl-lagerfeld-designs-bottles-diet-coke-126878).

76. Mr. Lagerfeld's renown for his collaborations with iconic brands dramatically increases the likelihood of consumer confusion concerning an affiliation, connection, or association between New Balance and Lagerfeld. It is possible that had New Balance authorized Lagerfeld to design a special Lagerfeld-edition of the iconic New Balance 620 shoe, the Lagerfeld shoe might have been a highly successful collaboration—as it was with J. Crew. New Balance, however, never authorized or licensed Lagerfeld to use its trademarks and/or trade dress.

77. In addition to direct confusion, Lagerfeld's use of a block letter K and virtually identical design also is likely to cause initial interest and post-sale confusion, to the irreparable harm and detriment of New Balance and the substantial goodwill it has developed in the trademarks and trade dress.

78. Finally, as a result of his leading position in luxury goods, Mr. Lagerfeld's products are routinely counterfeited. Given its unique ability to elicit counterfeits, Lagerfeld has a correspondingly unique ability to damage New Balance in the marketplace. Specifically, Lagerfeld's shoe is likely to cause others to market and sell counterfeit Lagerfeld shoes, which

22

also will infringe and further dilute the New Balance trademarks and trade dress. Upon information and belief, in light of its knowledge of its brand strength, Lagerfeld was aware of this unique risk when it chose to infringe the New Balance trademarks and trade dress.

79.     As a result of the foregoing New Balance has and will suffer irreparable harm and monetary harm in an amount to be determined at trial.

## COUNT I
### (Trademark Infringement—15 U.S.C. § 1114)
### (The Block N Marks)

80.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 79 above as if fully set forth herein.

81.     As described above, New Balance is the owner of the distinctive and federally registered Block N Marks.

82.     New Balance's ownership and exclusive use in commerce of the Block N Marks predates the use by Defendants' block capital K mark.

83.     Upon information and belief, Defendants' conduct is willful and intentional and intended to free-ride off of the goodwill associated with the Block N Marks. Defendants are and were at all relevant times both actually and constructively aware of New Balance's prior use, ownership, and registration, and Defendants' conduct is therefore also willful and intentional.

84.     Defendants use the block capital K mark in interstate commerce in connection with the sale, offering for sale, distribution, and/or advertising of its goods.

85.     Defendants' use in commerce of the block capital K mark, as described above, constitutes trademark infringement in violation of 15 U.S.C. § 1114 in that it is without New Balance's consent and is likely to cause confusion, mistake, and/or deception among consumers. Such conduct has and will irreparably harm New Balance and the goodwill it has developed in the Block N Marks.

23

86. As a direct and proximate result of Defendants' violations of 15 U.S.C. § 1114, New Balance has been and will continue to be damaged.

87. Upon information and belief, Defendants have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to New Balance as a result of its wrongful conduct.

88. Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT II
### (False Designation of Origin—15 U.S.C. § 1125(a))
### (The Block N Marks)

89. New Balance repeats and realleges the allegations contained in paragraphs 1 through 88 above as if fully set forth herein.

90. As described above, New Balance is the owner of the distinctive and federally registered Block N Marks.

91. New Balance's ownership and exclusive use in commerce of the Block N Marks predates the use by Defendants' block capital K mark.

92. Upon information and belief, Defendants' conduct is willful and intentional and intended to free-ride off of the goodwill associated with the Block N Marks. Defendants are and were at all relevant times both actually and constructively aware of New Balance's prior use, ownership, and registration, and Defendants' conduct is therefore also willful and intentional.

93. Defendants use the block capital K mark in interstate commerce in connection with the sale, offering for sale, distribution, and/or advertising of its goods.

94. Defendants' use in commerce of the block capital K mark, as described above, constitutes false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A) in that it is likely

24

to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with New Balance and/or as to the origin, sponsorship, or approval by New Balance of Defendants' goods, services, or commercial activity. Such conduct has and will irreparably harm New Balance and the goodwill it has developed in the Block N Marks.

95.     As a direct and proximate result of Defendants' violations of 15 U.S.C. § 1125, New Balance has been and will continue to be damaged.

96.     Upon information and belief, Defendants have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to New Balance as a result of its wrongful conduct.

97.     Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

### COUNT III
### (Dilution—15 U.S.C. § 1125(c))
### (The Block N Marks)

98.     New Balance repeats and realleges the allegations contained in paragraphs 1 through 97 above as if fully set forth herein.

99.     As described above, New Balance is the owner of the distinctive and federally registered Block N Marks.

100.    New Balance's ownership and exclusive use in commerce of the Block N Marks predates the use by Defendants' block capital K mark.

101.    Through consistent and continued use, product promotion, and consumer and industry recognition, New Balance has developed the New Balance Block N Marks to the point that they are famous. Defendants did not begin using the block capital K mark in commerce until after the New Balance Block N Marks became famous.

25

102.  Upon information and belief, Defendants' conduct is willful and intentional and intended to free-ride off of the goodwill associated with the Block N Marks. Defendants are and were at all relevant times both actually and constructively aware of New Balance's prior use, ownership, and registration, and Defendants' conduct is therefore also willful and intentional.

103.  Defendants' block capital K mark used in the context of a virtually identical shoe design is likely to cause dilution of the distinctive qualities of the New Balance Block N Marks in violation of 15 U.S.C. § 1125(c).

104.  As a direct and proximate result of Defendants' violations of 15 U.S.C. § 1125, New Balance has been and will continue to be damaged.

105.  Upon information and belief, Defendants have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to New Balance as a result of its wrongful conduct.

106.  Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT IV
## (Trademark Infringement—15 U.S.C. § 1114)
## (The Block N Mark with Saddle Device)

107.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 106 above as if fully set forth herein.

108.  As described above, New Balance is the owner of the distinctive and federally registered Block N Mark with Saddle Device.

109.  New Balance's ownership and exclusive use in commerce of the Block N Mark with Saddle Device predates the use by Defendants' block capital K mark on a saddle device.

26

110. Upon information and belief, Defendants' conduct is willful and intentional and intended to free-ride off of the goodwill associated with the Block N Mark with Saddle Device. Defendants are and were at all relevant times both actually and constructively aware of New Balance's prior use, ownership, and registration, and Defendants' conduct is therefore also willful and intentional.

111. Defendants use the block capital K mark on a saddle device in interstate commerce in connection with the sale, offering for sale, distribution, and/or advertising of its goods.

112. Defendants' use in commerce of the block capital K mark on a saddle device, as described above, constitutes trademark infringement in violation of 15 U.S.C. § 1114 in that it is without New Balance's consent and is likely to cause confusion, mistake, and/or deception among consumers. Such conduct has and will irreparably harm New Balance and the goodwill it has developed in the Block N Mark with Saddle Device.

113. As a direct and proximate result of Defendants' violations of 15 U.S.C. § 1114, New Balance has been and will continue to be damaged.

114. Upon information and belief, Defendants have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to New Balance as a result of its wrongful conduct.

115. Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT V
### (False Designation of Origin—15 U.S.C. § 1125(a))
### (The Block N Mark with Saddle Device)

116. New Balance repeats and realleges the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

27

117. As described above, New Balance is the owner of the distinctive and federally registered Block N Mark with Saddle Device.

118. New Balance's ownership and exclusive use in commerce of the Block N Mark with Saddle Device predates the use by Defendants' block capital K mark on a saddle device.

119. Upon information and belief, Defendants' conduct is willful and intentional and intended to free-ride off of the goodwill associated with the Block N Mark with Saddle Device. Defendants are and were at all relevant times both actually and constructively aware of New Balance's prior use, ownership, and registration, and Defendants' conduct is therefore also willful and intentional.

120. Defendants use the block capital K mark on a saddle device in interstate commerce in connection with the sale, offering for sale, distribution, and/or advertising of its goods.

121. Defendants' use in commerce of the block capital K mark on a saddle device, as described above, constitutes false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A) in that it is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with New Balance and/or as to the origin, sponsorship, or approval by New Balance of Defendants' goods, services, or commercial activity. Such conduct has and will irreparably harm New Balance and the goodwill it has developed in the Block N Mark with Saddle Device.

122. As a direct and proximate result of Defendants' violations of 15 U.S.C. § 1125, New Balance has been and will continue to be damaged.

123. Upon information and belief, Defendants have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to New Balance as a result of its wrongful conduct.

28

124. Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT VI
### (Dilution—15 U.S.C. § 1125(c))
### (The Block N Mark with Saddle Device)

125. New Balance repeats and realleges the allegations contained in paragraphs 1 through 124 above as if fully set forth herein.

126. As described above, New Balance is the owner of the distinctive and federally registered Block N Mark with Saddle Device.

127. New Balance's ownership and exclusive use in commerce of the Block N Mark with Saddle Device predates the use by Defendants' block capital K mark on a saddle device.

128. Through consistent and continued use, product promotion, and consumer and industry recognition, New Balance has developed the New Balance Block N Mark with Saddle Device to the point that it is famous. Defendants did not begin using the block capital K mark on a saddle device in commerce until after the New Balance Block N Mark with Saddle Device became famous.

129. Upon information and belief, Defendants' conduct is willful and intentional and intended to free-ride off of the goodwill associated with the Block N Mark with Saddle Device. Defendants are and were at all relevant times both actually and constructively aware of New Balance's prior use, ownership, and registration, and Defendants' conduct is therefore also willful and intentional.

130. Defendants' block capital K mark on a saddle device used in the context of a virtually identical shoe design is likely to cause dilution of the distinctive qualities of the New Balance Block N Mark with Saddle Device in violation of 15 U.S.C. § 1125(c).

29

131. As a direct and proximate result of Defendants' violations of 15 U.S.C. § 1125, New Balance has been and will continue to be damaged.

132. Upon information and belief, Defendants have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to New Balance as a result of its wrongful conduct.

133. Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT VII
### (False Designation of Origin—15 U.S.C. § 1125(a))
### (Trade Dress Infringement—Family Trade Dress)

134. New Balance repeats and realleges the allegations contained in paragraphs 1 through 133 above as if fully set forth herein.

135. As described above, New Balance is the owner of Family Trade Dress.

136. The Family Trade Dress is distinctive and has acquired secondary meaning among consumers, who exclusively associate the design with New Balance. The primary significance of the Family Trade Dress is to indicate New Balance as the source.

137. The Family Trade Dress is not functional.

138. New Balance's ownership and use in commerce of the Family Trade Dress predates the use by Defendants of a confusingly similar design.

139. Upon information and belief, given the fame and renown of the Family Trade Dress, Defendants' conduct is willful and intentional and intended to free-ride off of the goodwill associated with it. Defendants are and were at all relevant times aware of New Balance's prior use and ownership of the trade dress, and Defendants' conduct is therefore also willful and intentional.

30

140. Defendants use a virtually identical overall footwear design in interstate commerce in connection with the sale, offering for sale, distribution, and/or advertising of its goods.

141. Defendants' use in commerce of the virtually identical overall footwear design, as described above, constitutes false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A) in that it is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with New Balance and/or as to the origin, sponsorship, or approval by New Balance of Defendants' goods, services, or commercial activity. Such conduct has and will irreparably harm New Balance and the goodwill it has developed in the Family Trade Dress.

142. As a direct and proximate result of Defendants' violations of 15 U.S.C. § 1125, New Balance has been and will continue to be damaged.

143. Upon information and belief, Defendants have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to New Balance as a result of its wrongful conduct.

144. Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT VIII
### (False Designation of Origin—15 U.S.C. § 1125(a))
### (Trade Dress Infringement—620 Trade Dress)

145. New Balance repeats and realleges the allegations contained in paragraphs 1 through 144 above as if fully set forth herein.

146. As described above, New Balance is the owner of 620 Trade Dress.

147.    The 620 Dress is distinctive and has acquired secondary meaning among consumers, who exclusively associate the design with New Balance. The primary significance of the 620 Trade Dress is to indicate New Balance as the source.

148.    The 620 Trade Dress is not functional.

149.    New Balance's ownership and use in commerce of the 620 Trade Dress predates the use by Defendants of a confusingly similar design.

150.    Upon information and belief, given the fame and renown of the 620 Trade Dress Defendants' conduct is willful and intentional and intended to free-ride off of the goodwill associated with it. Defendants are and were at all relevant times aware of New Balance's prior use and ownership of the trade dress, and Defendants' conduct is therefore also willful and intentional.

151.    Defendants use a virtually identical overall footwear design in interstate commerce in connection with the sale, offering for sale, distribution, and/or advertising of its goods.

152.    Defendants' use in commerce of the virtually identical overall footwear design, as described above, constitutes false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A) in that it is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with New Balance and/or as to the origin, sponsorship, or approval by New Balance of Defendants' goods, services, or commercial activity. Such conduct has and will irreparably harm New Balance and the goodwill it has developed in the 620 Trade Dress.

153.    As a direct and proximate result of Defendants' violations of 15 U.S.C. § 1125, New Balance has been and will continue to be damaged.

154. Upon information and belief, Defendants have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to New Balance as a result of its wrongful conduct.

155. Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT IX
### (New York Common Law Unfair Competition and Misappropriation of Intellectual Property Rights)

156. New Balance repeats and realleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

157. As described above, New Balance is the owner of valid and protectable trademark and trade dress rights. New Balance's trademarks and trade dress are distinctive and, to the extent necessary, have acquired secondary meaning.

158. New Balance's ownership and exclusive use in commerce of its trademarks and trade dress predates the use by Defendants.

159. The above described acts, including, but not limited to, Defendants' adoption and use of a confusingly similar block capital letter K and overall confusingly similar footwear design, constitute common law unfair competition and misappropriation of New Balance's intellectual property rights.

160. Defendants misappropriated the labors and expenditures of New Balance in bad faith.

161. As a direct and proximate result of Defendants' unfair competition, New Balance has been and will continue to be damaged.

33

162.    Upon information and belief, Defendants have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to New Balance as a result of its wrongful conduct.

163.    Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT X
### (New York Statutory Dilution—N.Y. Gen Bus. L. Sec. 360-1)

164.    New Balance repeats and realleges the allegations contained in paragraphs 1 through 163 above as if fully set forth herein.

165.    As described above, New Balance is the owner of valid and protectable trademark and trade dress rights. New Balance's trademarks and trade dress are distinctive and, to the extent necessary, have acquired secondary meaning.

166.    New Balance's ownership and exclusive use in commerce of its trademarks and trade dress predates the use by Defendants.

167.    Defendants' adoption and use of a confusingly similar block capital letter K and overall confusingly similar footwear design is likely to cause injury to New Balance's business reputation and/or of dilution of the distinctive quality of its trademarks and/or trade dress.

168.    Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

34

## COUNT XI

### (New York Statutory and Common Law Trademark Infringement—N.Y. Gen Bus. L. Sec. 360-o)

169.    New Balance repeats and realleges the allegations contained in paragraphs 1 through 168 above as if fully set forth herein.

170.    As described above, New Balance is the owner of valid and protectable trademark and trade dress rights. New Balance's trademarks and trade dress are distinctive and, to the extent necessary, have acquired secondary meaning.

171.    New Balance's ownership and exclusive use in commerce of its trademarks and trade dress predates the use by Defendants.

172.    Defendants' adoption and use of a confusingly similar block capital letter K and overall confusingly similar footwear design is likely to cause confusion among relevant consumers.

173.    As a direct and proximate result of Defendants' unfair competition, New Balance has been and will continue to be damaged.

174.    Upon information and belief, Defendants have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to New Balance as a result of its wrongful conduct.

175.    Defendants' conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Defendants are restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT XII
### (Unjust Enrichment)

176.    New Balance repeats and realleges the allegations contained in paragraphs 1 through 175 above as if fully set forth herein.

35

177.    Through the conduct described above Defendants were enriched at New Balance's
expense and it is against good equity and conscience to permit Defendants to retain any profits or
other rewards from its conduct.

178.    Defendants' conduct was with a deceptive intent.

179.    Defendants' conduct is causing and will continue to cause New Balance to suffer
irreparable harm and, unless Defendants are restrained, New Balance will continue to be so
damaged, because it has no adequate remedy at law.

## **PRAYERS FOR RELIEF**

WHEREFORE, New Balance respectfully requests the following relief:

A.    That this Court declare that the Family Trade Dress and 620 Trade Dress are valid and
enforceable;

B.    That this Court preliminarily and permanently enjoin Defendants, their employees,
agents, servants, and all in privity with any of them, from using the New Balance Block
N Marks, Block N Mark with Saddle Device, Family Trade Dress, and/or 620 Trade
Dress, or any derivative(s) thereof or any design(s) similar thereto, in commerce;

C.    That this Court enter an order recalling all confusingly similar Lagerfeld footwear
presently manufactured and distributed;

D.    That this Court enter an order pursuant to 15 U.S.C. § 1118 for the destruction of any
infringing goods;

E.    That this Court require an accounting of profits by Defendants;

F.    That this Court award New Balance Defendants' profits and/or compensatory damages in
an amount to be determined at trial;

G.    That this Court award New Balance treble damages;

H.    That this Court award New Balance its attorneys' fees and costs; and

36

I.   That this Court award New Balance such other and further relief that this Court deems

just and proper.

## JURY DEMAND

New Balance demands a trial by jury of all claims so triable.

Respectfully submitted,

NEW BALANCE ATHLETIC SHOE, INC.,

By its attorneys,

R. David Hosp (RH3344)
FISH & RICHARDSON P.C.
601 Lexington Avenue
52nd Floor
New York, New York 10022
Tel: (212) 765-5070
Fax: (212) 258-2291
hosp@fr.com

Mark S. Puzella (*pro hac vice* forthcoming)
Sheryl K. Garko (*pro hac vice* forthcoming)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, Massachusetts 02210
Tel.: (617) 368-2125
Fax: (617) 542-8906
puzella@fr.com
garko@fr.com

Dated: June 3, 2014

38